UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ADRIANO CORTEZ<br><br>Defendant | No. 20-CR-10198-FDS |

### SENTENCING MEMORANDUM

Now comes the United States and respectfully submits this Memorandum in support of its sentencing recommendation of 180 months' incarceration and a period of supervised release of 48 months for defendant Adriano Cortez, who was convicted following a five-day jury trial of Conspiracy to Distribute and to Possess with Intent to Distribute 40 Grams or More of Fentanyl (Count 1s) and Possession with Intent to Distribute 100 Grams or More of Heroin and 40 Grams or More of Fentanyl (Count 2s). This sentence is an upward variance from the defendant's applicable guideline sentencing range, which is 121-151 months, based on consideration of the factors under 18 U.S.C. § 3553(a). Given the nature of the defendant's offense, his role in the offense, and most importantly, his personal history and characteristics, a sentence of 180 months is appropriate.

### FACTS

The government summarizes below the facts proven at trial and additional relevant conduct.

A. *Weymouth Case*

On March 30, 2015, Weymouth Police arrested the defendant after they found him carrying fentanyl/heroin, heroin and cocaine. Presentence Investigation Report ("PSR") ¶¶ 18–

19.  Before he was arrested, the defendant refused to stop his car for police, left his car in the middle of an intersection and caused the car to crash, and then led police on a foot-chase through the snow before police finally brought the defendant to the ground and apprehended to him.  *Id.* ¶¶ 13–18.

Specifically, earlier that evening, while conducting surveillance, officers saw the defendant engage in activity consistent with a hand-to-hand cocaine transaction with a male named T.C.  *See id.* ¶¶ 11-12.  Police confronted T.C., who admitted that he had bought cocaine from the defendant.  *Id.* ¶ 12.  After speaking with T.C., the police attempted to stop the defendant's Ford Fusion.  *Id.* ¶ 13.  The defendant refused to stop the car and would not even put it into park after the police had boxed in the car from the front and back with their vehicles.  *Id.* ¶ 13.  Police finally had to break the car window, at which point the defendant jumped over his passenger and started running from police.  *Id.* ¶ 14-15.  In the meantime, the car, while still in the drive position, drove itself across the intersection into a set of bushes in front of a bank in the Weymouth Landing commercial district.  *Id.* ¶ 16.

While running from police, despite numerous commands to obey police commands, the defendant did not comply and police had to physically bring the defendant to the ground to apprehend him.  *Id.* ¶ 17.  The defendant had numerous drugs on his person, including 19.7 grams of cocaine, a separate package of 27.63 grams of cocaine, 73.26 grams of a mixture of fentanyl and heroin, and 70.23 grams of heroin.  *Id.* ¶ 18.  (At trial, the jury found that the quantity of the fentanyl involved in the Weymouth incident was more than 40 grams and the weight of the heroin was more than 100 grams.  *Id.* ¶ 19).

The defendant was originally charged in connection with the Weymouth incident in Norfolk Superior Court and the Court placed the defendant on a GPS bracelet.  *Id.* ¶ 18. Then, in

2017, the defendant was charged with a separate drug incident in Dorchester District Court. *Id.* Because the defendant had committed this drug incident while on release and thus violating his Superior Court bail conditions, the Superior Court altered the defendant's GPS bracelet monitoring to restrict the defendant to home confinement at 332 Geneva Avenue, in Dorchester, MA. *Id.*

 B. *Boston Undercover Buys*

Thereafter, despite having open cases in Norfolk Superior Court and Dorchester District Court, and being on court-ordered home confinement, the defendant continued dealing drugs as the Boston Police Department conducted 10 undercover buys of cocaine and fentanyl with the defendant between September and November 2017. *Id.* ¶ 20.

For all ten controlled buys, the defendant used couriers to deliver the fentanyl or cocaine to the two Boston Police undercover officers (the "UCs"). *Id.* ¶ 21. The defendant maintained contact with the UCs by cell phone during the transactions. *Id.* ¶ 25. The defendant directed the UCs where to meet his couriers, the defendant supplied the fentanyl and cocaine to be delivered to the UCs, and couriers returned the drug proceeds back to the defendant after the deals. *Id.* ¶ 21. Evidence at trial showed that the GPS unit that was attached to the defendant at the time of the undercover buys showed him located in the vicinity of 332 Geneva Avenue for each of the undercover buys. *Id.* ¶ 24.

During one phone call coordinating one of the undercover buys, on October 19, 2017, the defendant boasted to the UC about his extensive experience as a drug trafficker. *Id.* ¶ 26. The statements of the defendant included that:

- He's been in the "game" for years.
- He meets people "behind closed doors."
- He does not want to be "locked up."
- He does not want the UC to "get snatched up."
- What he does is "not legal."

3

C. *Defendant's Flight from Law Enforcement*

On or about November 21, 2017, the defendant cut off his state-ordered GPS monitor and fled Massachusetts. *Id.* ¶ 46. In mid-June 2020, at approximately the same time that the complaint and warrant for the defendant's arrest in this case were unsealed and many of the defendant's associates, including his brother, Damian, were arrested, the defendant left California for Colorado. *See* Transcript of Probable Cause and Detention Hearing, Exhibit 1, pp. 20-21.

D. *Denver, Colorado Domestic Assault*

On July 13, 2020, while obtaining cell site warrants to attempt to locate the defendant, the government learned that the Denver, Colorado Police were also looking for the defendant after he violently assaulted a woman at the Main Stay Suites in Denver. *Id.* at 24-25.

According to the victim, she met the defendant in California and had been dating him for approximately two months when, in June 2020, they traveled to Colorado for what she thought was a quick trip. *Id.* at pp. 6, 57.

After arriving in Colorado, the defendant advised her that he was on the run from law enforcement, specifically, the FBI, and that they would not be returning to California. *Id.* at 21-22. On July 13, 2020, after the victim told the defendant she wanted to leave him, the defendant violently assaulted her, threatening her life and the life of her mother, stating that he would kill them both because she knew who he was. *Id.* at 22-24. The defendant struck her in the head several times, pinned her to ground, strangled her with both of his hands, and attempted to suffocate her with a pillow. PSR ¶ 68. The defendant has not filed an objection to this paragraph of the PSR. The victim was able to escape the assault and contacted law enforcement.

Ex. 1 at 16-17.  Later that day, the U.S. Marshals and the Colorado Violent Offender Task Force located the defendant and took him into custody on the warrant in the instant case.  *Id.*

## GUIDELINES CALCULATION

The Government agrees with the PSR's calculation of the defendant's Guideline sentencing range.  Specifically:

A. Base Offense Level - The government agrees that the base offense level is 24 based on a converted drug weight of 289.18 kg. (PSR ¶ 51).

B. Organizer/Leader Enhancement – The government agrees that an enhancement of 4 levels for organizer/leader is appropriate given that the defendant directed the ten undercover buys involving eight couriers.  *Id.*  ¶ 54.  The defendant supplied the drugs, the defendant directed the details of the deals, such as the time and place, and the defendant received the drug proceeds.

C. Obstruction of Justice Enhancement – The government agrees that the first obstruction of justice enhancement is appropriate given the defendant's attempt to flee from the police in Weymouth, refusing to stop his car in the middle of a commercial district, jumping over his passenger, running from the police and refusing police commands.  *Id.* ¶ 55.

D. Obstruction of Justice Enhancement – The government agrees that the second obstruction of justice enhancement is appropriate given the defendant appears to have fled from prosecution for the instant offense after he had been charged and there was a warrant for his arrest.  *Id.*¶ 56.

## ARGUMENT

As described below, analysis of the Section 3553(a) factors demonstrates that a sentence of 180 months, an upward variance from Defendant's Guideline sentencing range, is appropriate.

A. *Nature and Circumstances of the Offense*

The defendant's offense is serious and warrants a lengthy period of incarceration.  In both 2015 and 2017, the defendant was distributing fentanyl, heroin and cocaine.  The defendant used eight separate couriers to deliver drugs to the two UCs in 2017.  These facts alone show the extent and reach of the defendant's drug business, let alone his admission in his own words that he has been in the "game" for years.  Moreover, the defendant's distribution of fentanyl and

heroin is very serious given the continuing opioid epidemic in Massachusetts. In 2020, more than 2,000 people in Massachusetts died from an opioid overdose.[1] Prior to this, it is believed that in 2015, approximately 1,768 people in Massachusetts died from opioid overdoses, in 2016, approximately 2,155 people died from opioid overdoses and in 2017, 1,977 people.[2]

    B. *History and Characteristics of the Defendant*

The defendant's history and characteristics warrant an upward variance here. First, during the Weymouth incident, the defendant showed disregard for human life, putting himself, law enforcement and the public at grave risk. When the police attempted to stop the defendant's vehicle, he refused to stop the car. He would not put his car in park. Even after the police boxed in his vehicle, the defendant still refused to comply. The police were forced to break the defendant's window. The defendant still refused to comply and jumped over his passenger and out the passenger window. The defendant's car then careened across the road, through an intersection, and hit bushes before coming to a stop. Then, the defendant led the police on a foot pursuit through the snow and continued his refusal to surrender. The police had to bring him to the ground. Because of the defendant's actions, drugs actually exploded all over his clothes. *See* Gov't Trial Exs. 1.9, 10.10 (photographs of defendant's jacket). As the Court is well aware and the CDC notes, being around fentanyl is fraught with danger. According to the CDC's website: "Exposure to fentanyl may be fatal. Fentanyl is estimated to be 80 times as potent as morphine and hundreds of times more potent than heroin."[3] In fleeing from the police in the manner that

---

[1] *See* https://www.mass.gov/fighting-the-opioid-crisis#:~:text=In%202020%2C%20more%20than%202%2C000,opioids%2C%20fentanyl%2C%20and%20heroin.

[2] *See* https://www.mass.gov/doc/opioid-related-overdose-deaths-among-ma-residents-february-2018/download

[3] https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750022.html

he did, the defendant showed no regard for the inherent dangers of fentanyl to himself, the police or the public in Weymouth. Moreover, the defendant's car careened off the road into a bush as he fled. Again, this demonstrates a complete disregard for the safety of the community as the car could have hit an innocent bystander.

Regrettably, the defendant's past conduct evidences a pattern of escalating, dangerous criminal behavior and suggests that a lengthy term of imprisonment is necessary to protect the public from future crimes of the defendant for as long as possible. As described above, while the defendant was charged with the Weymouth case, he picked up another drug case in Dorchester District Court. His arrest in Weymouth was not enough to deter him from committing new crimes. Then, while the defendant was on GPS monitoring and home confinement, the defendant continued to commit new crimes in conducting the ten controlled buys with the UCs. The defendant then violently assaulted his girlfriend in Colorado at the same time that he admitted to her that he was wanted by police. This history shows the defendant's proclivity to criminal conduct; indeed, his crimes have become more serious over time. The defendant has demonstrated utter disrespect for the law and how his actions are harmful to society. An above-Guidelines sentence is called for to reflect the fact that the defendant continued to commit crimes that increased in intensity and danger even while he had open cases pending.

C. *Serious of the Offense/Adequate Deterrence/Protect the Public*

A sentence of 180 months is also justified under other factors under Section 3553(a), including: (i) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct and (c) to protect the public from further crimes of the defendant. First, this was a very serious offense. The defendant trafficked heroin, fentanyl and cocaine in both 2015 and 2017 and in Boston and Weymouth. His offenses reached a wide geographic region that caused substantial

7

harm to the community. Second, general deterrence is an important factor here, too. A sentence of 180 months would put potential fentanyl and heroin traffickers on notice that pedaling such drugs will come with stiff penalties. Unfortunately, given the defendant's record, it seems unlikely that the defendant can be specifically deterred from criminal conduct. However, as already noted, a substantial sentence of 180 months will protect the public from any future crimes of the defendant for a significant period of time.

## CONCLUSION

For all of those reasons stated above, the United States respectfully requests a sentence of 180 months and period of supervised release of 48 months.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   /s/ John T. Mulcahy
John T. Mulcahy
Sarah B. Hoefle
Assistant United States Attorneys
617-748-3641

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ John T. Mulcahy
John T. Mulcahy

Date: April 28, 2022